995 So.2d 754 (2008)
C.A. CAVAGNARO and Wanda Cavagnaro, Appellants
v.
COLDWELL BANKER ALFONSO REALTY, INC., Appellee.
No. 2006-CA-01818-COA.
Court of Appeals of Mississippi.
February 19, 2008.
Rehearing Denied July 22, 2008.
Certiorari Denied October 23, 2008.
*755 Floyd J. Logan, Gulfport, attorney for appellants.
Gail D. Nicholson, Chester D. Nicholson, Gulfport, attorneys for appellee.
Before KING, C.J., BARNES and ISHEE, JJ.
BARNES, J., for the Court.
¶ 1. C.A. and Wanda Cavagnaro appeal the judgment of the Harrison County Circuit Court which affirmed the County Court of Harrison County, which awarded Coldwell Banker Alfonso Realty (Alfonso) a real estate commission in the amount of $30,900, attorneys' fees of $5,000, and $2,416.51 in expenses. The dispute at issue arose from a contract of sale between the Cavagnaros and Edward and Yvonne Hartnett for the purchase of the Cavagnaros' home in Long Beach, Mississippi. The sale fell through when it was discovered that the driveway encroached upon the adjoining property. Finding no reversible error, we affirm the judgment of the circuit court.

FACTS AND PROCEDURAL HISTORY
¶ 2. The Cavagnaros were the owners of a residence and lot in Long Beach, Mississippi, which they purchased in 1990. When the Cavagnaros purchased the residence, the driveway consisted of shells and gravel; however, after the purchase, they *756 paved the driveway. Unbeknownst to the Cavagnaros, the paved driveway encroached on the neighbor's property by twenty-eight inches.
¶ 3. Due to Mr. Cavagnaro's health, the couple made the decision to sell the property. They entered into a 120-day exclusive authorization to sell agreement with Alfonso and its agent, Barbara Gay. The agreement was set to terminate on September 3, 2000. The Hartnetts, residents of Arkansas, desired to relocate to the Mississippi Gulf Coast and hired Sandra Hutchison, also an Alfonso agent. Subsequently, the Cavagnaros and the Hartnetts entered into a contract for the sale and purchase of real estate for the Long Beach residence with a purchase price of $515,000. Alfonso was authorized by the contract to act as a dual agent. The Hartnetts originally wrote into the contract a closing date of no later than January 15, 2001; however, the Cavagnaros requested that the closing date be November 30, 2000.
¶ 4. On the seller's disclosure sheet filled out by Mrs. Cavagnaro, she stated that a survey of the property was performed in 1990. She also checked "no" in answer to the question: "Are there any right of way, easements, or similar matters that may affect your ownership interest in the property?" After another survey of the property was conducted, the encroachment was discovered. None of the parties involved in this action were aware of the encroachment prior to this survey. Due to the discovery of the encroachment, the closing did not take place on November 30, 2000. Rather, the Hartnetts executed an addendum to the sales contract which granted an additional ten days to cure the encroachment and provided that the seller would incur the cost and the purchaser would receive "clear title, no exceptions." The original contract of sale required only marketable title to be conveyed to the purchaser. Mrs. Cavagnaro signed the addendum; however, the portion which required the seller to incur the costs of removing the encroachment was struck through.
¶ 5. Kenny Jones, an attorney representing the Gulf Coast Board of Realtors, was consulted by both parties to assist in solving the encroachment problem. Jones made several suggestions as to how to solve the encroachment problem, including the following: (1) obtaining title to the encroachment from the neighbors; (2) obtaining title insurance; (3) filing a lawsuit for adverse possession of the encroachment; and (4) moving the driveway. With regard to acquiring title of the encroachment, the neighbors were willing to execute a permissive use agreement but would not agree to a permanent transfer or easement. Jones was also unable to find anyone willing to write a title insurance policy without including an exception for possible litigation as a result of the encroachment. As for the adverse possession suggestion, the Hartnetts were not receptive to the idea because it could not be accomplished in a timely fashion. Finally, the Hartnetts would not consent to moving the driveway because it would change the aesthetics of the property and possibly damage a large, stately oak tree. Accordingly, Jones testified at trial that the Cavagnaros were unable to meet their contractual obligation of conveying the property to the Hartnetts by warranty deed as was required by the contract without breaching the warranties of seisin and quiet enjoyment.
¶ 6. At the conclusion of the ten-day extension, the Hartnetts sought the return of their earnest money deposit and signed a release at Alfonso's request. The contract of sale required that, prior to returning the earnest money, the agent was to provide written notice to the seller by either hand delivery, signed for by the *757 addressee, or by certified mail, with both stating that the repayment of the earnest money would be made unless the party submitted a written protest within five days of the notice. Prior to returning the earnest money, Gay took the release to Mrs. Cavagnaro, who refused to sign it. Mrs. Cavagnaro conceded at trial that Gay gave her the release. She testified that she did not tell Gay not to return the earnest money to the Hartnetts, and she never objected to the return of the money until legal proceedings began. Gay signed the mutual release on the line designated for the broker's signature and returned the money to the Hartnetts on December 14, 2000.
¶ 7. The Hartnetts subsequently purchased another home in Pass Christian, Mississippi. Gay acted as the seller's agent, and Hutchison as the buyer's agent. The two shared the commission from the sale of the property. The Cavagnaros eventually signed a listing agreement with another realtor and sold their home to another buyer.
¶ 8. When the Cavagnaros allegedly refused to pay certain expenses,[1] Alfonso filed suit in the Justice Court of Harrison County. The justice court ruled in favor of Alfonso. After the Cavagnaros appealed to the County Court of Harrison County, they filed a counterclaim against Alfonso alleging breach of fiduciary duty and negligent failure to close the Hartnett sale. Alfonso answered the counterclaim by moving to dismiss the underlying action for the expenses and later filed a declaratory judgment action in the Harrison County Chancery Court seeking a resolution as to whether Alfonso was entitled to the commission from the Hartnett sale. After the Cavagnaros filed a motion to dismiss the declaratory judgment on the grounds that Alfonso had elected its remedy in the justice court, the chancellor transferred the declaratory judgment action and the appeal to the county court and ordered the cases consolidated.
¶ 9. Alfonso then moved to voluntarily dismiss the justice court complaint without prejudice because the appeal was before the county court de novo. The county court granted the motion, and the justice court action was dismissed without prejudice. Subsequently, the declaratory judgment action and the counterclaim were tried in a bench trial by Special County Court Judge William Agin. At the conclusion of the bench trial, the Cavagnaros moved to dismiss the counterclaim. After taking matters under advisement and requesting letter briefs to be submitted within thirty days, the county court entered judgment in favor of Alfonso and awarded a real estate commission in the amount of $30,900, attorney's fees in the amount of $5,000, repairs costs in the amount of $2,416.52, court costs, and prejudgment interest at a rate of 8%.
¶ 10. On October 19, 2006, the Cavagnaros appealed the county court judgment to the Circuit Court of Harrison County, which affirmed the county court judgment. The Cavagnaros then perfected this appeal, raising the following issues: (1) whether Alfonso is estopped from claiming a commission due to breach of its fiduciary duty to the Cavagnaros as a dual agent; (2) whether Alfonso waived the real estate commission by unilaterally executing a general release of the Hartnetts; (3) whether the county court erred in granting judgment to Alfonso for the sum of $2,416.52 when Alfonso dismissed that claim in justice court and failed to plead it *758 in the declaratory judgment action; and (4) whether the county court erred in granting Alfonso attorney's fees in the amount of $5,000 when there was no competent proof that the fees were reasonable and necessary. Finding no reversible error, we affirm the judgment of the circuit court.

STANDARD OF REVIEW
¶ 11. "The county court is the finder of fact, and we, like the circuit court, are bound by the judgment of the county court if supported by substantial evidence and not manifestly wrong." CEF Enters., Inc. v. Betts, 838 So.2d 999, 1002 (¶ 10) (Miss. Ct.App.2003) (citing Patel v. Telerent Leasing Corp., 574 So.2d 3, 6 (Miss.1990)). "Such findings may not be disturbed on appeal provided there is substantial supporting evidence in the trial record." Id. at (¶ 10) (citing Dungan v. Dick Moore, Inc., 463 So.2d 1094, 1100 (Miss.1985)).

ANALYSIS

I. Whether Alfonso is estopped from claiming a commission due to a breach of its fiduciary duty to the Cavagnaros as a dual agent.
¶ 12. The Cavagnaros argue that Alfonso is estopped from claiming a commission due to a breach of its fiduciary duty. They contend that Alfonso breached its fiduciary duty when Gay ordered a survey on the property only two days before the scheduled closing, proposed an extension of only ten days to cure the encroachment problem, and abandoned efforts to close the sale within a reasonable time only to begin negotiating to sell the Hartnetts another property. The Cavagnaros rely on the following language regarding the standard of care required of real estate brokers:
The standard of care of an agent has been described as "a duty to use the degree of diligence and care which a reasonably prudent person would ordinarily exercise in the transaction of his own business. . . ." More specifically, "a business agent represents that he understands the usages of the business in which he is employed. One undertaking a matter involving special knowledge ordinarily thereby represents that he has the special knowledge required, and undertakes that, so far as it is necessary to keep in touch with events, he will do so."
Lee Hawkins Realty, Inc. v. Moss, 724 So.2d 1116, 1120-21 (¶ 25) (Miss.Ct.App. 1998) (citations omitted).
¶ 13. With regard to the timing of the survey, the Cavagnaros argue that the fact that the encroachment was not discovered until two days before the closing was the result of Alfonso's failure to schedule the survey earlier, and this constituted a breach of its fiduciary duty. However, attorney Kenny Jones testified that it is customary for real estate brokers to delay ordering a survey until shortly before the closing in order to avoid an unnecessary expense if the sale does not close. The county court found that there was no evidence that the timing of the survey was the result of a breach of Alfonso's fiduciary duty to the Cavagnaros. As the county court noted, there was no evidence that Alfonso had any knowledge of the encroachment until the survey was completed, and the Cavagnaros had a survey of the property done in 1990 which revealed no encroachment problems or other information that would lead anyone to anticipate a problem. The county court also found that "[t]here was nothing that required the seller in this case to wait to get a new survey." The circuit court agreed with the above findings of the county court, as do we. There is no evidence that Alfonso breached its fiduciary duty with respect to the survey.
*759 ¶ 14. The Cavagnaros next argue that Alfonso breached its fiduciary duty when its agent decided on only a ten-day extension to attempt to cure the encroachment problem. The contract of sale between the Cavagnaros and the Hartnetts stated as follows:
Title shall be good and marketable, subject only to the following items recorded in the Chancery Clerk's office of said county: easements without encroachments, applicable zoning ordinances, protective covenants and prior mineral reservations; otherwise Purchaser, at his option, may either (a) if defects cannot be cured by the desired closing date, cancel this contract, in which case all earnest money deposited shall be returned; (b) accept title as is or; (c) if the defects are of such a character that they can be remedied by legal action within a reasonable time, permit seller such reasonable time to perform this curative work at Seller's expense. In the event curative work is performed by the Seller, the time specified herein for closing of this sale shall be extended for a reasonable period necessary for such action.
(Emphasis added). Despite this contract provision, which did not require the Hartnetts to grant any extension of the closing date, the Cavagnaros contend that Alfonso breached its duty by inserting only a ten-day time period which they argue was not a reasonable time period in which to cure the encroachment problem. They cite a Missouri appeals court decision which states that a "reasonable length of time to cure a title defect contemplates the time it would take to proceed with due diligence to correct the defect, considering the character of the defect and the acts necessary to be performed in order to correct it." Politte v. Wall, 256 S.W.2d 283, 284 (Mo. Ct.App.1953) (citing Johnson v. Schuchardt, 333 Mo. 781, 787, 63 S.W.2d 17, 19 (1933)). They argue that a reasonable real estate broker would have allowed a longer time period or would have sought an extension at the end of the ten days in order to continue efforts to close the sale.[2]
¶ 15. It does not appear that the county court specifically addressed this argument.[3] However, the circuit court did, and we agree with the circuit court's finding that there is no evidence that Alfonso breached its fiduciary duty to the Cavagnaros in setting the ten-day extension period. As the circuit court found, while Alfonso decided on the ten-day time period, the Cavagnaros executed the addendum agreeing to the ten-day extension. Therefore, they were aware that they would have only ten days to cure the problem and voiced no objection to the time period. They similarly never made any effort to further extend the contract in order to allow more time to cure the encroachment *760 problem.[4]
¶ 16. For the proposition that the ten-day extension period was unreasonable, the Cavagnaros rely on Jones's testimony that, of the options available for curing the problem, moving the driveway was the only option that reasonably could have been achieved within ten days. Mr. Hartnett rejected the option of moving the driveway, and the addendum, signed by the Cavagnaros, states "purchaser requests the drive way stay in tact." The Cavagnaros contend that they never refused any of the other options. The other options, however, were either not available or were unacceptable to the Hartnetts. Mr. Hartnett was not receptive to an easement, and no formal offer of an easement was made by the neighbors. Permissive use was the only firm offer that was made and that could be withdrawn at will. Jones testified that he was unable to find anyone willing to write a title insurance policy on the property without taking exception to the possible litigation resulting from the encroachment. Finally, the option of adverse possession was ruled out because it could not be accomplished within the allotted time period.[5]
¶ 17. Not only did the Hartnetts reject certain solutions advanced by the Cavagnaros, but there was also no indication that the sale would have been completed had Alfonso sought an additional extension of time.[6] The Cavagnaros cite the testimony of attorney Al Koennen as support for their argument that the property was insurable with the encroachment; therefore, they could have conveyed marketable title. Koennen testified that, as the closing attorney on the sale of the Cavagnaros' home to another buyer after the deal with the Hartnetts fell through, he wrote a title insurance policy for the Cavagnaro property. However, he also testified that he never saw a copy of the survey and did not learn about the encroachment until after the closing took place. He stated that the buyer did not make an issue of the encroachment, and if he had been made aware of the encroachment, he would have noted it in the policy. Koennen further testified that, while the encroachment would not have been an exception to the title of the property, it would have been an exception as to any coverage on any lawsuit that materialized. In fact, he stated that the policy he wrote had a survey exception. Therefore, the title insurance policy written by Koennen would not have protected against litigation arising from the encroachment.[7] Moreover, the fact *761 that the Cavagnaros may have found a solution to the problem of the encroachment after the fact is not controlling in this case. The parties agreed to a ten-day extension, and the testimony revealed that Alfonso and Jones were unable to find anyone who would write title insurance on the property without an exception for the encroachment. There is no indication that Alfonso and Jones were not diligent in their efforts.
¶18. The Cavagnaros also argue that Alfonso breached its fiduciary duty by abandoning efforts to close the Cavagnaro sale and then negotiating to sell the Hartnetts a different property despite having knowledge that the Cavagnaros had not signed the mutual release. They argue that these were actions of self-interest which were adverse to the Cavagnaros' interest. With regard to this issue, the circuit court agreed with the following holding of the county court:
The purchase of a different house by the Hartnetts was going to generate a commission for some real estate agent who brought the buyer to the seller. In the facts of this case, it just so happened that the same [Alfonso] agents were involved with both properties.
[T]his Court cannot find any evidence to suggest or prove that the collapse of the sale resulted from a breach of [Alfonso's] duty to its client. The transaction failed as a result of one big unanticipated mess.
We agree. There is simply no evidence in the record indicating that Alfonso's agents breached any duty to the Cavagnaros in negotiating the sale of another property to the Hartnetts. Alfonso did not simply abandon the sale of the Cavagnaros' home. The ten-day extension in the contract of sale, agreed to by the Cavagnaros, had run, and the parties were unable to cure the defect in the title resulting from the encroachment. At that point, as the circuit court found, the Hartnetts had the right to cancel the contract and receive all earnest money deposited since the defect in the driveway was not cured. By signing the release and requesting the earnest money, the Hartnetts had indicated an intention to do so. Moreover, although Mrs. Cavagnaro refused to sign the mutual release, Alfonso told Mrs. Cavagnaro that it was going to return the earnest money to the Hartnetts, and it is undisputed that Mrs. Cavagnaro did not object or inform Alfonso not to do so. Thus, we agree with the county court's finding that Alfonso did not breach its fiduciary duty to the Cavagnaros by selling another home to the Hartnetts.
¶19. The Cavagnaros also argue that Alfonso breached its fiduciary duty by participating in a material alteration of the sales contract by including in the addendum granting the ten-day extension the phrase "purchaser is to have clear title no exceptions." The Hartnetts argue that, because the Cavagnaros did not raise this argument in either the county or circuit court, the issue is procedurally barred and not properly before this Court. The Cavagnaros contend that the issue has been raised throughout the litigation and therefore is not procedurally barred; however, while the record indicates that the Cavagnaros made the argument in their appeal brief to the circuit court, it is unclear whether they raised the issue in the county court. The claim was not specifically made in the Cavagnaros' counterclaim, and the county court did not address it, nor did *762 the circuit court. Whether or not the claim is procedurally barred, we find it to be without merit.
¶20. The Cavagnaros contend that the original contract only required that marketable title be conveyed to the purchaser and that the language in the addendum was, therefore, more restrictive. However, it was the Hartnetts, not Alfonso, who added the language requiring clear title. The Cavagnaros appear to contend that Alfonso had a duty to object to the alteration. However, the Cavagnaros signed the addendum, and they point to no portion of the record indicating that they voiced any kind of objection to the addition of the above language. Accordingly, there is nothing to indicate that Alfonso should have been aware that the Cavagnaros were not amenable to the addition. We note that the Hartnetts were not required to execute any addendum and had the right to cancel the contract immediately when it became obvious that the closing could not take place by November 30, 2000. Therefore, we fail to see how Alfonso or the Cavagnaros could have successfully objected to the revision. Thus, Alfonso did not breach its fiduciary duty to the Cavagnaros with regard to the added language.
Based on the foregoing analysis, we affirm the judgment of the circuit court as it pertains to this issue.

II. Whether Alfonso waived the real estate commission by unilaterally executing the mutual release and unilaterally repaying the earnest money to the Hartnetts.
¶21. The Cavagnaros argue that the county court erred in finding that Alfonso did not waive the commission by unilaterally returning the earnest money to the Hartnetts. The contract of sale between the Hartnetts and the Cavagnaros contained the following provision regarding the return of the earnest money:
In the event the transaction is not consummated, the above named Broker/Trustee shall hold such funds in escrow until: (a) all parties to the transaction have agreed in writing as to their disposition; or (b) a court of competent jurisdiction orders such disbursement of the funds; or (c) the above named Broker/Trustee can pay the funds to the party who is entitled to receive them in accordance with the clear and explicit terms of this Purchase Agreement which established the deposit. In the latter event, prior to disbursement, the above named Broker/Trustee shall give written notice to each party not to be paid, by either: (a) hand delivery signed for by the Addressee; or (b) by certified mail, both stating that this payment will be made unless a written protest from that party is received by the Broker/Trustee within 5 business days of the delivery of the mailing, as appropriate, of that notice.

The Cavagnaros contend that Alfonso waived its right to the commission by not complying with this provision and providing written notice of its intent to return the earnest money to the Hartnetts. They rely on the following language of this Court:
Mississippi Code Annotated section 73-35-21 specifies that a real estate broker or salesman may be denied the privilege to conduct business for acting for more than one party in a transaction without the knowledge of all parties involved. The prohibition of such an act follows the long established recognition that a broker holds a fiduciary relationship with its attendant duties to his/her principal requiring full disclosure, frankness and honesty in dealings with the principal. *763 "Moreover, he must not put himself in a position antagonistic to the principal's interest by fraud or by representing others with interests adverse to his principal's interests." A broker is subject to a duty to act solely for the benefit of the principal in all matters connected with the agency.
Lane v. Oustalet, 850 So.2d 1143, 1151 (¶25) (Miss.Ct.App.2002) (overruled on other grounds) (citations omitted).
¶22. The circuit court found that, while it is true that no written notice was given, the record is clear that Mrs. Cavagnaro was notified by Alfonso of its intent to return the money, and she did not object. Thus, the circuit court concluded that Alfonso did not unilaterally return the earnest money deposit. We agree. As the circuit court found, when the ten-day extension period expired and the encroachment problem had not been cured, the Hartnetts requested return of their earnest money deposit and signed the release required by Alfonso. Alfonso agent Gay then hand delivered the release to Mrs. Cavagnaro and informed her that the earnest money was going to be returned to the Hartnetts. Although Mrs. Cavagnaro refused to sign the release, it is undisputed that she did not object to the return of the earnest money. Based on the facts that Gay informed Mrs. Cavagnaro that she was going to return the earnest money and that Mrs. Cavagnaro did not object to such return, the circuit court found that Alfonso did not unilaterally return the earnest money. Mrs. Cavagnaro testified that when Gay told her that she was going to return the earnest money to the Hartnetts, Mrs. Cavagnaro told Gay that she was not signing the release form, but Mrs. Cavagnaro did not tell her not to return the earnest money. Mrs. Cavagnaro further testified that she did not know she had the option to refuse the return of the earnest money; thus, in her mind, telling Gay that she would not sign the release was equivalent to telling her not to return the earnest money. Mrs. Cavagnaro stated that she had expected Gay to tell her to put something in writing if she did not want her to return the money.
¶23. We agree with the circuit court's finding. Mrs. Cavagnaro was provided notice that the earnest money was going to be returned, and she failed to object. Mrs. Cavagnaro argues that she was not aware that she could make a written protest to the return of the earnest money and that Alfonso failed to advise her of this right. While Alfonso may have never specifically informed the Cavagnaros of the right to object to the return of the earnest money, the contract of sale, which Mrs. Cavagnaro signed, clearly stated that the parties had the right to object to the return of the money within five days of the notice. Although Alfonso did not wholly comply with the contract, Mrs. Cavagnaro was notified that the earnest money would be returned. If Mrs. Cavagnaro did not want Alfonso to return the money, she should have made some effort to make her wishes known.
¶24. The Cavagnaros rely on Politte, 256 S.W.2d at 285-86, in which the court held that a broker who returned the earnest money deposit without the knowledge or consent of the seller when it was still possible to correct a title defect forfeited his or her right to a commission. However, as the circuit court found, the Cavagnaros' reliance on Politte is misplaced. Here, the record shows that Alfonso consulted Mrs. Cavagnaro prior to returning the earnest money, and she did not object. Moreover, the Politte court specifically stated that "[h]ad there been a complete and incurable failure of title a totally different situation would have presented itself, for in that event the right of the *764 purchaser to take down his deposit would have been absolute and it would have been the duty of the broker to return it." Id. at 286. In this case, although we express no opinion as to whether the encroachment was completely incurable had the parties an unlimited amount of time, the fact remains that the ten-day extension agreed to by all the parties had expired and the Hartnetts had requested return of their earnest money. Even assuming Mrs. Cavagnaro had not been given notice of the return of the earnest money, we cannot say that Politte would support the Cavagnaros' contention that Alfonso waived its right to the commission.[8]
¶25. The Cavagnaros also argue that the county court's erroneous factual finding that the Cavagnaros executed the mutual release was a major premise for the court's finding that the Cavagnaros were unable to perform their obligations under the contract and for the court's holding that Alfonso did not breach its fiduciary duty. They contend that, as a result of this finding, the court failed to address the reasonable time to cure provisions in the contract of sale; the contract's requirement that Alfonso provide written notice prior to returning the earnest money; and the fact that, rather than seeking an extension of time to close the Cavagnaro sale, Alfonso was actively pursuing the sale of another home to the Hartnetts. However, this contention was not borne out by the county court's opinion. While the county court did state erroneously that the Cavagnaros executed the mutual release, there is nothing in the county court's opinion to suggest that this finding was a "major premise" for the finding that there is no evidence that Alfonso breached its fiduciary duty to the Cavagnaros. Moreover, as discussed above, we agree with the circuit court's analysis regarding these issues. Accordingly, this claim is without merit.

*765 III. Whether the county court erred in granting judgment to Alfonso for the sum of $2,416.52 when Alfonso dismissed that claim.
¶26. The Cavagnaros contend that the county court erred in finding that Alfonso was entitled to $2,416.52 in expenditures for repair costs because Alfonso moved to dismiss the claim for the expenditures by voluntary nonsuit in the county court under Rule 41 of the Mississippi Rules of Civil Procedure. However, as the circuit court found, the record indicates that the justice court complaint was dismissed without prejudice. Thus, the dismissal of the justice court action did not preclude the county court from awarding the expenditures to Alfonso.
¶27. The Cavagnaros argue that the complaint for the declaratory judgment did not replead or request recovery for the expenditures. The complaint for declaratory judgment is not included in the record in this case; therefore, we are unable to determine for ourselves what was sought therein. However, the record does indicate that, at the hearing in the county court, the issue of whether the declaratory judgment action encompassed the repair costs was discussed, and the judge reviewed the declaratory judgment complaint.[9] The county court then awarded the repair costs to Alfonso; therefore, the court presumably found that the declaratory judgment action sought such costs. On appeal, the circuit court found that the record indicated that the declaratory judgment action was for both the commission and the repair costs. As the Cavagnaros have not provided this Court with a copy of the complaint but merely state in conclusory fashion that the complaint did not request the repair costs, we have no basis for questioning the county or circuit court's finding in this regard.
¶28. The Cavagnaros also argue that the county court should not have awarded the expenditures to Alfonso because there was no evidence presented indicating that Alfonso had in fact paid the repair costs. They argue that, while the contractors who provided the services may be owed for their work, those contractors are not before this Court and have made no claim against the Cavagnaros. However, the trial testimony reveals that it was Alfonso who secured the contractors to do the repair work and the repairs were billed to Alfonso. Moreover, Mrs. Cavagnaro testified that she authorized and benefitted from the expenditures but she never paid them. The contractors are entitled to be paid for their work, and we find no error in the county court's awarding the repair costs to Alfonso so that such payment can be made. This issue is without merit.

IV. Whether the county court erred in granting judgment to Alfonso for attorneys' fees of $5,000 when there was no competent proof of their reasonableness and necessity.
¶29. The Cavagnaros contend that there is no proof as to the reasonableness or necessity of the attorneys' fees claimed by Alfonso or that the bill had been paid by Alfonso. They argue that the county court arbitrarily awarded $5,000 in attorneys' fees to Alfonso with no proof to support the amount. "The standard of review regarding attorneys' fees is the abuse of discretion standard, and such awards must be supported by credible evidence." Miss. Power & Light Co. v. Cook, 832 So.2d 474, 486 (¶39) (Miss.2002) (citing Regency Nissan, Inc. v. Jenkins, 678 So.2d *766 95, 103 (Miss.1995)). As the Cavagnaros note, attorneys' fees "should not be plucked out of the air." Dynasteel Corp., v. Aztec Indus., Inc., 611 So.2d 977, 986 (Miss.1992). However, in these circumstances, we cannot say that the county court's award of attorneys' fees is unreasonable or unsupported. As the circuit court found, an itemized list of attorneys' fees was admitted into the record showing a fee amount of $9,801.65. The county court awarded approximately half of this amount to Alfonso, or $5,000.
¶30. We acknowledge that the Mississippi Supreme Court has held that certain factors should be considered when determining whether attorneys' fees are reasonable and that the trial court should make specific factual findings with regard to those factors. BellSouth Pers. Commc'n., LLC v. Bd. of Supervisors, 912 So.2d 436, 448 (¶39) (Miss.2005).[10] In this case, the county court did not specifically mention the pertinent factors nor make any specific factual findings; however, the court did state the following:
The contract also provides that [Alfonso] is entitled to reasonable attorney's fees if the broker is required to collect the commission through legal action. Applying the rule and considerations in Dynasteel Corporation v. Aztec Industries, Inc. 611 So.2d 977 (Miss.1992), this Court is of the opinion that [Alfonso] is entitled to attorney's fees in the amount of $5,000 plus court costs.
The factors for determining the reasonableness of attorneys' fees are discussed in Dynasteel; therefore, we interpret this statement as an indication that the trial court considered the factors identified in Dynasteel in determining the award amount. In Upchurch Plumbing, Inc. v. Greenwood Utils. Comm'n, 964 So.2d 1100, 1116 (¶39) (Miss.2007), the Mississippi Supreme Court affirmed a trial court's award of attorneys' fees, finding that it was "clear from the language of the trial judge's order that the judge did in fact apply the ... factors even though he did not detail his reasoning."
¶31. Moreover, if the Cavagnaros were dissatisfied with the county court's lack of specific factual findings regarding the factors, they were provided a mechanism for requiring that the court make such findings. Mississippi Rule of Civil Procedure 52(a) provides as follows:
In all actions tried upon the facts without a jury the court may, and shall upon the request of any party to the suit or when required by these rules, find the facts specifically and state separately its conclusions of law thereon and judgment shall be entered accordingly.
M.R.C.P. 52(a) (emphasis added). Here, the Cavagnaros could have requested the county court to make more specific findings but did not do so. In addition, the $5,000 in attorneys' fees awarded by the county court is not so extreme as to be *767 unreasonable; rather, it is approximately half of the amount itemized by Alfonso's attorneys. See Miss. Power & Light Co., 832 So.2d at 487 (¶42) (stating that the trial court abused its discretion in awarding an extreme amount of attorneys' fees without applying the McKee factors and making factual determinations). Finally, the Cavagnaros have not demonstrated why the award is unreasonable or unwarranted. They point to no entry in the itemized statement that they believe is unreasonable or unnecessary. The statement reveals that Alfonso's attorneys dedicated a total of 51.7 hours to this case over a period of approximately fifteen months. At trial, the general manager of Alfonso testified that the itemized statement accurately reflected the work performed by Alfonso's attorneys.
¶32. While we encourage trial courts to address each factor specifically and make factual findings pertaining thereto when awarding attorneys' fees so that we, as an appellate court, may adequately determine the appropriateness of an award, we cannot say under the facts of this case that the circuit court erred in upholding the award of $5,000 to Alfonso for attorneys' fees. Accordingly, we affirm the award of $5,000 in attorneys' fees to Alfonso.
¶33. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., MYERS, P.J., IRVING, CHANDLER, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. LEE, P.J. AND GRIFFIS, J., NOT PARTICIPATING.
NOTES
[1] When the Hartnetts required a home inspection and survey of the residence, Gay hired a surveyor and several repair people, the cost of which amounted to $2,416.51 and was billed to Alfonso. The Cavagnaros never reimbursed Alfonso for these expenses.
[2] Gay testified that she did not know if ten days would be sufficient time to cure the encroachment nor did she inquire of Jones or anyone else regarding the issue.
[3] The county court stated: "Specifically with regard to the Cavagnaros' counterclaim, this Court cannot find any evidence to suggest or prove that the collapse of the sale resulted from a breach of Coldwell's duty to its client. The transaction failed as a result of one big unanticipated mess." The Cavagnaros' counterclaim does not specifically state that the ten-day period was not reasonable; rather, it states that "the failure of the transaction to close is fully due to the failure of the Plaintiff/Counter-Defendant to handle the pre-closing matters in a timely and professional manner consistent with loan closing practices, and consistent with the interests of the Defendants/Counter-Plaintiffs." However, there was extensive testimony elicited at trial regarding who set the ten-day period and whether it was sufficient to cure the title defect.
[4] Mr. Hartnett testified that the reason he did not seek an additional extension was because he was told that ten days was sufficient in order to solve the problem of the encroachment and because he and his family were ready to get on with their lives. He stated that someone had told them that it could take sixty to ninety days to fix the problem, and they did not want to wait that long.
[5] The county court found that the driveway was paved within a few months of when the Cavagnaros purchased the home in 1990. The circuit court stated that it was paved within four to five months after the purchase; however, the circuit court later found that the Cavagnaros could not confirm that the driveway had been in place for ten years, and the Hartnetts were not interested in participating in litigation.
[6] It also appears that the Cavagnaros, on November 8, 2000, offered a proposed addendum to the contract that reduced the purchase price by $10,000 in order to offset any legal fees arising from the encroachment. The Hartnetts did not agree to the addendum.
[7] Koennen also testified there is a form of insurance coverage, called affirmative coverage, that would accommodate the risk from the encroachment on the adjoining property. The Cavagnaros cite this testimony as support for the contention that they could have conveyed marketable title. However, the fact that there was one option that was possibly not pursued does not indicate that a duty was breached. The record reveals that the parties were unable to find anyone who would write title insurance covering the encroachment within the ten-day period.
[8] The Cavagnaros also rely on four other cases for the proposition that the act of returning an earnest money deposit to the purchaser without the consent of the seller defeats the claim of the broker to a commission. However, these cases are readily distinguishable from the case at bar. In Lake Co. v. Molan, 269 Minn. 490, 500, 131 N.W.2d 734, 740 (1964), the Minnesota Supreme Court found that "where an agreement for the sale of land gives the seller the right to declare a forfeiture of the purchaser's deposit upon the latter's failure to consummate the sale, a broker who returns such deposit to a defaulting purchaser without the seller's authorization may not recover a commission from the seller." In Goss v. Hill, 219 Md. 304, 306-09, 149 A.2d 10, 10-13 (1959) and Prince Georges Properties, Inc. v. Rogers, 275 Md. 582, 594-95, 341 A.2d 804, 811 (1975), the Maryland Court of Appeals held that, when the contract of sale states that, in the event the purchaser defaulted on the contract, the broker's commission would come from the earnest money deposit, the broker waived any right to the commission when he or she returned the earnest money to the purchaser without the consent of the seller, and thereby extinguished the fund from which the commission was to derive. Finally, in Crabtree v. Board of Trustees, 512 S.W.2d 311, 313 (Ky.1974), the Kentucky Court of Appeals held that the broker, by returning the earnest money deposit without the authorization of the seller, waived the right to claim a commission even though the purchaser may not have defaulted. Here, although the contract of sale does allow the earnest money deposit to be forfeited as liquidated damages should the purchaser default on the contract and the broker's commission to be one half of that earnest money, there has been no allegation that the Hartnetts defaulted on the sales contract. Rather, when it was determined that the closing could not take place by November 30, 2000, the Hartnetts were entitled to cancel the contract and to request the return of the earnest money. Instead, they executed the addendum granting a ten-day extension. When the ten-day period expired, they were again entitled to rescind the contract. Moreover, as discussed above, Alfonso informed Mrs. Cavagnaro that the Hartnetts were requesting the return of the earnest money, and although she refused to sign the mutual release, she did not object to the return of the money. Therefore, the Cavagnaros' reliance on the above cases is misplaced.
[9] At the hearing held on the pretrial motions, counsel for Alfonso repeatedly represented to the county court that the declaratory judgment action encompassed the repair costs.
[10] The factors, derived from McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982) and Rule 1.5 of the Mississippi Rules of Professional Conduct, are as follows:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.